**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**UNITED STATES OF AMERICA**

**vs.**                                    **5:06cr193/MCR
                                        5:08cv259/MCR/MD**

**JOHN Q. DURFEY**

---

## REPORT AND RECOMMENDATION

This matter is before the court upon defendant's second amended motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255 (doc. 147). The government has filed a response (doc. 155) and the defendant has filed a reply (doc. 161).[1] The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After a careful review of the record and the arguments presented, it is the opinion of the undersigned that defendant has not raised any issue requiring an evidentiary hearing, Rules Governing Section 2255 Cases 8(a) and (b), and that the motion should be denied.

## I. BACKGROUND

Defendant John Q. Durfey and co-defendant Rhonda K. Fenwick were charged in a 124 count indictment as follows:

---

[1] The court also received a pleading entitled "motion under U.S.C. § 2255 to vacate, set aside, or correct a sentence by a person in federal custody" which essentially reiterates and summarizes the claims made in his earlier submissions. The clerk was directed to docket the pleading as a "supplement," although it could have been returned to the defendant without docketing in light of the procedural posture of the case.

Count 1 of the Indictment charged that between August of 2001 and August 30, 2006, Durfey and Fenwick conspired to commit offenses against or defraud the United States relating to Heath Care Fraud and Mail Fraud, in violation of 18 U.S.C. §§ 371, 1341, 1347 and 1349.

Counts 2 - 35 charged Durfey and Fenwick with the substantive counts of the execution of the plan to defraud health care benefit programs, in violation of 18 U.S.C. §§ 1347 and 2.

Counts 36 - 45 charge Durfey with the substantive counts of Mail Fraud; that is, using private and commercial interstate carriers to execute a plan to defraud the United States or obtain money or property by false pretenses, in violation of 18 U.S.C. 1341.

Count 46 charged Durfey and Fenwick with the conspiracy to distribute and dispense controlled substances involving Oxycodone, Morphine, Fentanyl, Hydromorphone, methadone, Hydrocodone, dronobinol, Alprazolam, Diazepam, Zolpidem, and Clonazepam, all in violation of 21 U.S.C. §§ 841(a)(1), (B)(1)(C), and 846.

Counts 47 - 124 charged Durfey with the substantive counts of dispensing and distribution of controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (B)(1)(C), and (B)(1)(D). Counts 92 and 111 carried an enhanced penalty of 20 years to life imprisonment, since deaths resulted from the use of the Schedule II controlled substances distributed. Of these counts Fenwick was named only in Count 124, along with Durfey.

Defendant was represented by appointed counsel Christopher Patterson through the majority of the proceedings.[2]

On May 30, 2007, defendant appeared before the court to plead guilty to twelve of the counts of the indictment. (Doc. 62).[3] The court conducted preliminary

---

[2]Defendant was represented by private counsel, Harry Harper, before his indictment, and Spiro Kypreos represented the defendant during the initial proceedings in this case. Mr. Kypreos moved to withdraw in light of the fact that the trial was scheduled to take place in Panama City, Florida. (Doc. 37). The trial was subsequently relocated to Pensacola (doc. 53) but did not occur in light of the guilty pleas entered by both defendants.

[3]The plea proceeding was transcribed on July 11, 2007 before defendant's sentencing, although the voluntariness of defendant's plea was not made an issue until the instant motion.

questioning and explained defendant's rights to him.  Defendant indicated that he understood those rights and had discussed them with counsel.  (Doc. 62, 6-14).  The court then questioned the defendant about his signing of the plea and cooperation agreement and the statement of facts.  Specifically, defendant affirmed that no one had used any pressure or threats to try to get him to sign the agreement.  He also indicated that he understood the potential penalties he faced, he understood that no one could predict at that time what his sentence would be, except for the fact that it would not exceed the statutory maximum, and he understood that there was no guarantee that the government would file a substantial assistance motion.  (*Id.* at 18, 19-20, 21-24, 24-25).  The government noted that it would move to dismiss the remaining charges and also that it had agreed not to file any charges against the defendant's wife relating to the criminal conduct at issue.  (*Id.* at 20).

The court reviewed signed copies of the plea agreement and a statement of facts.[4] Defendant advised that he and his attorney had discussed the elements of the charges to which he would enter a plea and that he did not need the court to re-explain those.  He also admitted doing what the government said he had done in the statement of facts to the "best of [his] recollection."  (Doc. 62 at 28-31).  Counsel verified that he and his client had gone over the twelve counts to which the defendant was pleading guilty, and noted that the defendant had maintained a copy of the statement of facts and the plea agreement in his possession to review at his leisure.  (*Id.* at 31).  When asked if he had been satisfied with Mr. Patterson's representation of him, defendant indicated "very much so."  (*Id.* at 33).  In response to the court's inquiry about whether he needed clarification on any issue or needed to speak with his attorney any further, defendant said he had no questions.  (*Id.*).  After further routine questioning the court accepted defendant's guilty plea as to counts 3, 5, 9, 10, 11, 24, 50, 80, 88, 94, 101, and 108.  (*Id.* at 35-36).

---

[4]The original plea agreement had been misplaced, so an identical copy was signed by the defendant on the date of the hearing.  (Doc. 62 at 27).

Six of these counts involved billing for services not rendered and six counts involved the prescription of controlled substances outside the usual practice of medicine or for other than medical necessity. Further details about the offense conduct are set forth in the Presentence Investigation Report. (PSR ¶ 36-64). The defendant's base offense level was calculated at 36 using the marijuana equivalency table. (PSR ¶¶ 65-69). Defendant received a two level adjustment for his abuse of a role of public or private trust pursuant to U.S.S.G. § 3B1.3, and another two level adjustment for being an organizer, leader, manager or supervisor pursuant to U.S.S.G. § 3B1.1 due to his direction of the activities of co-defendant Fenwick. (PSR ¶¶ 79 & 79a). After a three level downward adjustment for acceptance of responsibility, his total offense level was 37. (PSR ¶¶ 81-82). Defendant had no criminal history points, and therefore a criminal history category of 1.

With respect to victim impact and other sentencing factors, the PSR identified restitution in the amount of $466,723.03 and noted that the estates of several individuals who died as a result of overdoses had been contacted and such information would be provided at sentencing. (PSR ¶¶ 70-71). The report further noted that a medical expert opined that Durfey's actions had played a direct role in the death of four individuals, and that the twelve counts to which the defendant pleaded guilty did not capture the seriousness of this harm. (PSR ¶ 84).

The maximum statutory penalty on counts 3, 5, 9, 10, 11 and 24 was ten years, and 20 years on counts 50, 80, 88, 94, 101, 108. The applicable guidelines range was 210-262 months. (PSR ¶¶123-125).

At sentencing counsel objected to the separate two level adjustments for the defendant's abuse of trust and for his role in the offense, contending that a single two-level increase was appropriate. (Doc. 86 at 3-5). The court overruled the objection finding that the two adjustments addressed different harms. (*Id.* at 7-8). The defense then called four witnesses to speak in the defendant's behalf. (*Id.* at 10-17). The defendant himself addressed the court, mentioning, among other things,

that he had been "threatened . . . by several patients with abandonment suits, malpractice suits and even personal injury if [he] did not continue writing scripts the way they thought they should be continued." (*id.* at 18,18-24). Counsel urged leniency for his client, noting his client's remorse and desire to be of assistance. (*Id.* at 24-26). The court specifically questioned counsel about Durfey's acceptance of responsibility in light of the content and tone of many of the letters it had received in his behalf, which appeared to suggest otherwise. Counsel assured the court that his client did accept responsibility for his actions. (*Id.* at 26-27). The government noted it had received letters from individuals whose loved ones had died as far back as 2003 as a result of prescriptions provided by the defendant, and it suggested that neither the letters the court received in defendant's behalf nor the defendant's statement to the court was a true indication of remorse. The AUSA also underscored the repeated instances of patients' urine tests showing that they were using cocaine or marijuana rather than the drugs that the defendant prescribed for them, and the fact that the defendant "did not get" the harm he was causing even after four of his patients died from overdoses. (*Id.* at 27-33). The government concluded by arguing that the section 3553 factors were adequately and appropriately addressed by a sentence within the guidelines range. (Doc. 86 at 33-34).

After a recess, the court addressed its remarks to a full courtroom of spectators to explain what the defendant's sentence must reflect under the law. The court enumerated the sentencing factors listed in 18 U.S.C. § 3553, and summarized some of the evidence it had considered in making its sentencing decision. (Doc. 86 at 37-48). In particular the court noted that defendant ignored the "controls" he had in place, thus ultimately causing his patients great harm. (*Id.* at 47). It then sentenced the defendant to the statutory maximum term of 240 months imprisonment. The court explained that this sentence was slightly higher than the midpoint of the guideline range to account for the harm caused to those who had

died.  (*Id.* at 48-49).  The court also ordered defendant to pay restitution in the amount of $466,723.03 and waived payment of a fine.  (*Id.* at 49).

After filing a notice of appeal, defense counsel moved to withdraw and filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).  On March 20, 2008, the Eleventh  Circuit granted counsel's motion to withdraw and affirmed the defendant's conviction and sentence finding that "independent examination of the entire record reveals no arguable issues of merit." (Doc. 133 at 3).

In the instant motion, defendant raises two main claims, each of which has numerous subparts.  First, defendant claims that he was deprived of constitutionally effective assistance of counsel, and second he asserts that his sentence did not fully comply with all of the provisions of 18 U.S.C. § 3553(a).  The government opposes the motion in its entirety.

### LEGAL ANALYSIS

**A.**    <u>General Legal Standards</u>

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.  A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law or (4) is otherwise subject to collateral attack.  28 U.S.C. § 2255; *Thomas v. Crosby,* 371 F.3d 782, 811 (11th Cir. 2004); *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"  *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). The "fundamental miscarriage of justice"

exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2678, 2649, 91 L. Ed. 2d 397 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent. . . ."

Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief," a defendant must support his allegations with at least a proffer of some credible supporting evidence. *See Chandler v. McDonough,* 471 F.3d 1360 (11th Cir. 2006) (citing *Drew v. Dept. of Corrections,* 297 F.3d 1278, 1293 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); *Hill v. Moore,* 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief."); *Ferguson v. United States*, 699 F.2d 1071, 1072 (11th Cir. 1983). A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record. *Peoples v. Campbell*, 377 F.3d 1208, 1237 (11th Cir. 2004); *Tejada v. Dugger,* 941 F.2d 1551, 1559 (11th Cir. 1991); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted). Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing. *Lynn*, 365 F.3d at 1239.

## B.   Ineffective assistance of counsel claims

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal. *Massaro v. United States,* 538 U.S. 500, 503, 123 S.Ct. 1690, 1693, 155 L.Ed.2d 714 (2003); *see also United States v. Patterson,* 595 F.3d 1324  (11th Cir. 2010); *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir.

2002); *United States v. Jiminez*, 983 F.2d 1020, 1022, n. 1 (11th Cir. 1993). In fact, they are by far the most common claims raised in § 2255 motions. The benchmark for judging a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To show a violation of his constitutional right to counsel, defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy. *Id.*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d (1984); *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Gaskin v. Secretary, Dept. of Corrections,* 494 F.3d 997, 1002 (11th Cir. 2007). "*Strickland's* two-part test also applies where a prisoner contends ineffective assistance led him or her to enter an improvident guilty plea." *Yordan v. Dugger,* 909 F.2d 474, 477 (11th Cir. 1990) (citing *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)); *United States v. Pease*, 240 F.3d 938, 941 (11th Cir. 2001). In applying *Strickland*, the court may dispose of an ineffective assistance claim if defendant fails to carry his burden on either of the two prongs. 466 U.S. at 697, 104 S.Ct. at 2069.

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065; *see also Dingle v. Secretary for Dept. of Corrections,* 480 F.3d 1092, 1099 (11th Cir. 2007)*; Atkins v. Singletary*, 965 F.2d 952 (11th Cir. 1992). "[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990) (citing *Harich v. Dugger*, 844 F.2d 1464, 1469 (11th Cir. 1988); *Dingle v. Secretary for Dept. of Corrections,* 480 F.3d 1092, 1099 (11th Cir. 2007)*; Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir. 2000); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir.

1989) (emphasizing that petitioner was "not entitled to error-free representation")). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Gordon v. United States,* 518 F.3d 1291, 1301 (11th Cir. 2008); *United States v. Freixas*, 332 F.3d 1314, 1319-1320 (11th Cir. 2003); (quoting *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002)(quoting *Strickland*, 466 U.S. at 687, 689-90, 104 S.Ct. at 2064-66 and *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)). When examining the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect." *Chandler*, 218 F.3d at 1316 n. 18.

With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687). Or in the case of alleged sentencing errors, defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. *Glover v. United States*, 531 U.S. 198, 203-04, 121 S.Ct. 696, 700-01, 148 L.Ed.2d 604 (2001). A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." *Id.*

To establish ineffective assistance, defendant must provide factual support for his contentions regarding counsel's performance. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *Wilson v. United States,* 962 F.2d 996, 998 (11th Cir. 1992); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990) (citing *Blackledge*, 431 U.S. at 74, 97 S.Ct. at 1629); *United States v. Ross*, 147 Fed.Appx. 936, 939 (11th Cir. 2005).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. *Dingle,* 480 F.3d at 1099; *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" *Dingle*, 480 F.3d at 1099 (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)). The Sixth Circuit has framed the question as not whether counsel was inadequate, but rather counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). With these standards in mind, the court will consider the defendant's individual claims, some of which will be grouped together for ease in discussion.

**1) Counsel failed to determine defendant's mental status**

Defendant claims that counsel failed to determine his mental status, and that this failure foreclosed a "diminished capacity" defense. In his § 2255 motion, defendant now concedes that due to his advanced age, he should have retired rather than continue to practice pain management medicine. He describes himself as "somewhat slower to learn" with a memory that "now fails him regularly." He suggests that during the time period in question his reasoning had diminished, his physical health was in decline due to necessary use of pain medication, and he was becoming forgetful and careless. This "diminished reasoning" gave opportunities for "some [unnamed] employees" to "take advantage, to alter and manipulate financial records, issue unauthorized prescriptions and engage in activities that would normally have been detected and prosecuted." He also claims to have succumbed to threats and manipulation by patients in an apparent fear of bodily harm.

Defendant concludes that he simply was not competent to render a knowing and voluntary plea of guilty due to his alleged diminished capacity, and he asserts that this was readily apparent to counsel and to some extent was apparent to the court. He appears to base his assumption on the "nature of the offense coupled with his history" which in his view lends "an obvious clue that something is seriously wrong."

In response to the defendant's assertions, counsel begins by unequivocally averring in his affidavit that he had no good faith basis upon which to advance an insanity defense pursuant to Fed.R.Crim.P.12.2. (Doc. 155-2 at 1). He notes that neither the defendant nor his wife suggested that defendant was adversely impacted by diminished capacity. Counsel also states that he had ample opportunity to observe his client in the more than 16 hours he spent with him prior to the entry of his plea, and Durfey did not exhibit signs of any mental defects or disease that impacted his ability to understand the process or to make critical decisions in his

case. (*Id.* at 1-2). Counsel enumerated conversations and discussions he had with Durfey and specifically noted the precision with which his client was able to recall details regarding the cases of various patients. (*Id.* at 2). He also noted correspondence that had passed between the two, including his letters explaining the various components of entering a plea in federal court (*Id.* at att. A) and Durfey's 18 letters detailing specific issues about client files. (*Id.* at 1-2).

In reply, Durfey accuses counsel of lying about the amount of time that he spent with Durfey (doc. 161 at 1). He also asserts that counsel "is not qualified to make a determination of mental impairment and should have investigated this issue." (*Id.* at 2). While counsel concededly is not (and is not expected to be) a mental health expert, if there is no reasonable basis to believe that his client is not competent, it is not reasonable to expect counsel to conduct an investigation of this issue, nor would expending seemingly needless effort be a wise defense strategy. Furthermore, to the extent Durfey now contends that his mental capacity was diminished such that he was not competent to stand trial, absent any reasonable cause for this belief, counsel would have been remiss as an officer of the court in filing a motion pursuant to 18 U.S.C. § 4241 for such a determination. Section 4241(d) provides that a defendant who is found to be "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense" shall be committed to the custody of the Attorney General for treatment in a suitable facility to determine when or whether defendant will attain the capacity to permit the proceedings to go forward. Defendant has not suggested and there is no record evidence that his alleged diminished capacity rises to this level.

Diminished capacity is also addressed in section 5K2.13 of the sentencing guidelines, in a policy statement. This section provides:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental

**capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.**

**"Significantly reduced mental capacity" is defined in the Application notes as meaning that the defendant, although convicted, has a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, comment. (n.1). There is nothing in the record that would suggest a downward departure under this section would have been appropriate.**

**Defendant next claims that due to his diminished capacity, he did not understand the various issues involved with the guilty plea. He also states that he does not recall receiving counsel's letters explaining the components of the plea, while failing to acknowledge that these very letters dated February 14 and May 16, 2007 are attached to his own § 2255 motion, and the February 14 letter contains numerous handwritten notations about its contents. (Doc. 147, exh. 9 and 15). His claim that he did not understand various issues regarding the guilty plea is contrary to his sworn assertions at rearraignment regarding his understanding of the proceedings and his satisfaction with counsel. (See e.g., doc. 62 at 10, 14, 15-16, 17, 19, 25, 26, 28, 29-30, 32, 33, 36). Solemn declarations made under oath in open court carry a strong presumption of verity. *Blackledge v. Allison,* 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)*; United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994). Furthermore, the record contains subtle indicator's of defendant's active engagement in and understanding of the proceedings. He stopped the proceeding at one point to ask a question of counsel (*id.* at 17); he did not robotically tell the court "yes" when asked whether he understood (see, e.g., *id.* at 22); the record reflects that at one point defendant's facial expression registered obvious confusion and the proceedings were stopped for clarification of the point at issue (*id.* at 26) and finally, after counsel asked for a moment to confer, defendant**

volunteered to the court that he understood and that he had gone over the issue with counsel, and he did not need to discuss it any further  (*Id.* at 29-30).  The written record simply does not support defendant's claim that he did not understand the plea that he was entering.

The district court did comment at sentencing that it was quite perplexed by the case because the defendant's conduct was not what one would normally expect to see from someone with his experience and with his background.  (Doc. 86 at 38).  However, the mere fact that one's conduct fell outside what might be expected does not automatically dictate the conclusion that one has diminished capacity under the law.

In *Strickland*, the Supreme Court stated that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions" because "[c]ounsel's actions are usually based, quite properly on ... information supplied by the defendant." 466 U.S. at 691, 104 S.Ct. at 2066.  In this case, defendant has not shown that counsel was constitutionally ineffective for failing to investigate or make argument to the court concerning defendant's mental capacity.  Furthermore, he has not established that he was prejudiced by counsel's failure to do so, as there is nothing in the record to support the conclusion that there was a viable angle on his claim of diminished capacity, such that the result of the proceedings would have been different had counsel investigated or argued this issue.

## 2) Coerced Plea

In a claim that is not entirely unrelated, defendant next contends that counsel promoted and coerced an "unknowing" and "involuntary" plea.  (Doc. 147-2 at 4).  Defendant asserts that but for counsel's "threats" and "fear-instilling advice," he would never have entered into a plea agreement, or agreed to any form of stipulation of sentencing facts, or agreed to any type of waiver of any right whatsoever.  (*Id.*)

He claims that he was frightened and manipulated into a plea he did not comprehend and was told to do and say things he neither understood nor agreed to, and were not necessarily truthful or accurate. (*Id.*)[5] Despite defendant's admissions during his statement to the court at sentencing, he now contends that he has maintained his innocence, only pleading guilty as a result of the government's threat to prosecute his wife and daughter. He cites two supporting affidavits for proof of the coercion. (Doc. 147, exh. 1 Cheshire Affidavit ¶ 7; doc. 147, exh. 3, Sumpton Affidavit ¶¶16-17).[6] He then notes counsel's letter of April 10, 2007 where counsel advised him as follows after discussions with AUSA Kunz:

> I confirmed that the government is looking into the possibility that Diane may have played a role in the fiances (sic) and subsequent placement of funds into various banks through an irrevocable trust. As this is a continuing investigation, I do not know much more than the Government has subpoenaed Diane's daughter in Georgia to answer questions about the funds and various transfers made at Diane's request. I am not able to give Diane any legal advice on this matter due to my representation of you.
>
> It is my opinion that this investigation into Diane's dealings might be stopped in the event you decide to enter a plea consistent with what we have previously discussed. I see this action as a means to continue to place pressure on you and your family. You need to carefully consider that this is a very real possibility. I see this threat as real.

(Doc. 155-2, exh. B). The government notes that by informing the defendant about what he knew about the government's investigation, counsel was not assisting in "coercion," but merely counsel was fulfilling his duty to the defendant. Counsel states that as a result of this information, as well as the lack of a credible expert

---

[5]Although this court did not observe the defendant's demeanor at rearraignment, as noted in the previous section, defendant appeared actively engaged in the process. He did not merely answer yes or no to every question he was asked, as the court has seen in some other cases.

[6]Cheshire states in his affidavit that he knew defendant was threatened that if he refused to plead guilty that his wife and daughter would be indicted and arrested, and Sumpton states that threats that defendant's wife would be imprisoned as an accessory were repeatedly brought to bear against the defendant.

witness to support Durfey's claims, the defendant instructed him to pursue plea negotiations. (Doc. 155-2, at ¶ 5). The fact that there was a possibility that Mrs. Durfey could be prosecuted is not disputed by the government. As noted above, AUSA Kunz openly stated at rearraignment that pursuant to the plea agreement it had agreed "not to file any charges with respect to Mrs. Diane Spencer Durfey, the wife of the defendant, relating to any concealment or transfer of assets during the criminal investigation in this case," a fact that was memorialized as part of the written agreement. (Doc. 62 at 20; doc. 58 at 2-3).

One of the things a court must determine before accepting a guilty plea is that it is voluntary and free from coercion. *Gordon v. United States,* 518 F.3d 1291, 1298 (11th Cir. 2008) (citing *United States v. Monroe*, 353 F.3d 1346, 1354 (11th Cir. 2003)). An allegation of a coerced plea, supported by a factual allegation, can support a §2255 motion. *See Fontaine v. United States*, 411 U.S. 213, 214-15, 93 S.Ct. 1461, 1462-63, 36 L.Ed.2d 169 (1973); *United States v. Lampazianie*, 251 F.3d 519, 524 (5th Cir. 2001). However, a defendant's statements during a Rule 11 colloquy as well as any findings made by the judge accepting the pleas constitute a formidable barrier in any subsequent collateral proceedings. *Blackledge v. Allison,* 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). After thorough questioning, the court specifically found at rearraignment that the defendant's decision to enter a plea of guilty was made voluntarily and of his own free will without any threats or pressure from anyone else. (Doc. 62 at 34)

The threat to arrest a person whom law enforcement has probable cause to arrest does not in and of itself render the accused's guilty plea invalid as a product of "coercion." *Newland v. Hall*, 527 F.3d 1162, 1189 (11th Cir. 2008); see also *Martin v. Kemp*, 760 F.2d 1244, 1247-48 (11th Cir.1985) (affirming the "governing legal principle" that where a defendant claims that his guilty plea is involuntary because prompted by police threats to prosecute a third party, the defendant bears the "heavy burden" of showing that at the time the threats were made, the police did not

have probable cause to believe that the third party had "committed a crime."); *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir.2001) (holding there was no police coercion when police officer told the accused that his girlfriend would be charged for murder unless he confessed, because the officer had probable cause to arrest the girlfriend for murder); *United States v. Johnson*, 351 F.3d 254, 257, 260-61, 263 (6th Cir.2003) (holding there was no police coercion when police threatened to arrest the accused's sister if the accused did not confess, because police had valid probable cause to arrest the sister); *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir.1986) (confession not involuntary due to police telling accused that his wife would be charged if he did not confess because the officer had probable cause to arrest the accused's wife at the time he made the alleged threat); see also *United States v. Nuckols*, 606 F.2d 566, 568-70 (5th Cir.1979) (same). Defendant asserts that his wife "was not a culpable party to any of the acts." (Doc. 147-4 at 12). It is true that she had no involvement in his offense conduct. However, the charges for which she was under investigation, were separate and distinct from the charges against him.

At the end of his argument, defendant asserts that the proof of the coercion lies in the fact that there was "no benefit to his plea bargain." (Doc. 147-2 at 7). This argument is ironic in that the very "benefit" to his plea bargain–that the government ceased investigation of and did not prosecute his wife–is the coercion of which he complains.[7] Contrary to defendant's assertions, Mrs. Durfey was not charged with any crime, as promised by the government in its plea agreement with the defendant. At sentencing, the court commented that the majority of the letters that it received on the defendant's behalf suggested that his intent in entering a plea was to protect his wife and family from further pain and suffering that might befall them if a trial

---

[7]Defendant also benefitted in that he pleaded guilty to only 12 of the 124 counts with which he was charged. The government dropped two counts involving the death of patients which would have resulted in a recommended advisory guideline sentence of life imprisonment. (Doc. 155-2, exh. M, letter dated February 23, 2007)

took place. (Doc. 86 at 26). Defendant's desire to protect his family, particularly if there was any potential merit to the charges under investigation, was not legally inappropriate so long as there was a factual basis for his guilty plea. The court asked counsel to verify, in light of the letters it had received, that there was no question about defendant's acceptance of responsibility, which counsel did, based both on his own belief and his client's statement to the court at sentencing. (Doc. 86 at 26-27).[8] There is no record evidence suggesting that the potential charges against the defendant's wife were baseless, or that the government was investigating the defendant's wife solely as a means of influencing the defendant. Thus, based on the foregoing authority, neither is there a legal basis for his claim that his guilty plea was coerced, nor is he entitled to relief on his claim that counsel was constitutionally ineffective for coercing an involuntary plea.

### 3. Counsel failed to challenge specific hardships on defendant prior to his plea

In his next ground for relief, defendant contends that counsel Spiro Kypreos was "completely ineffective" at his detention hearing, that Attorney Patterson failed to seek bond in his behalf after defendant had been ordered detained, and defendant was forced to endure "diesel therapy" prior to his plea.

Defendant asserts that his pre-trial detention seriously hampered his ability to assist counsel with his case because he could not access his records and easily communicate with counsel. This court has no doubt that defendant's incarceration

---

[8]Defendant states in his motion that the court framed its question to appear it was ensuring that the defendant's plea would qualify him for acceptance of responsibility, but notes that "the sincerity of this attempt is not reflected in the court's sentence." (Doc. 147-2 at 7). In making this argument, defendant disregards the fact that any defendant who pleads guilty must admit that he did what the government said that he did or the plea can not be accepted. If the defendant in this case was only pleading guilty to spare his family, rather than because he was guilty, he could not be found to have admitted his guilt or, stated in another way, accepted responsibility for his actions. It is true that "acceptance of responsibility" is a term of art with respect to sentencing. However, taken in context here, the court's questioning appears designed to verify that, despite what was suggested in the letters of support, defendant did not deny that there was a factual basis for his guilty plea, such that he would not be able to come back later to challenge that fact, as he attempts to do through the instant motion.

during pre-trial preparation was an inconvenience, as it would have been for any defendant. This fact is irrelevant to, and does not alter, Judge Bodiford's finding that detention was proper. Judge Bodiford determined that there was probable cause to believe that the defendant had committed an offense for which a maximum term of imprisonment of ten years or more applied, and there existed no condition or combination of conditions that would reasonably assure both the appearance of the defendant as required and the safety of the community. (Doc. 33). Defendant has not specifically suggested what attorney Kypreos could or should have done differently to secure his release. Once attorney Patterson became counsel of record, he had "extensive discussions" with the government trying to secure defendant's release. (Doc. 155-2, exh. C, letter of February 7, 2007). Counsel was told that the government would not agree to defendant's release because of the nature of the charges against him which included at least two deaths. (*Id.*) Counsel also suggested in correspondence to his client that the government's position was influenced by events that occurred prior to his appointment, including defendant's pre-indictment relocation to Ohio and a letter authored by Dianne to the prosecutor. (*Id.*)[9]  Defendant has failed to show that counsel's decision not to formally seek reconsideration of the court's detention order, particularly in light of the government's opposition to same, was professionally unreasonable or that defendant would have been released but for counsel's failure to pursue this matter.

Finally, the court is also at a loss to discern what defendant believes that counsel could have done to alter the "diesel therapy" that defendant contends he endured. At least one of counsel's letters indicated that he spoke with the U.S. marshal about defendant's custodial placement to request that defendant be moved closer to Bay County to assist in trial preparation. (Doc. 155-2, exh. C). U.S. Marshal Glenn Miller advised counsel that he did not want to continually move the defendant

---

[9]Neither the content of this letter nor the specific reason counsel thought it was prejudicial to defendant's opportunity for pre-trial release is explained in the record.

from place to place but rather thought it was best that defendant remain where his medical situation and providers could be stabilized. (*Id.*) Defendant has not shown that counsel's failure to pursue the "diesel therapy" issue had any cognizable effect on the outcome of the proceedings against him and he is not entitled to relief on this ground.

### 4. Failure to determine existence of a viable defense

Defendant next faults counsel for allegedly failing to determine if a viable defense existed. He claims that counsel made "no attempt to prepare for a trial or find exculpatory evidence."

Defendant explains that he personally retained Dr. Andrea M. Trescot to review and analyze several of his patients' records. Dr. Trescot has extensive credentials in the area of pain management, including Special Qualifications in Pain Managment; Diplomate American Board of Pain Medicine; Diplomate American Academy of Pain Management; Fellow, interventional Pain Practice; President, Florida Society of Interventional Pain Physicians; Executive VP, American Society of Pain Physians; and Diplomate American Board of Interventional Pain Physicians. (Doc. 147, exh. 1). Dr. Trescot stated in a brief letter that the records "appeared to meet the appropriate standard of care and did not reflect a deviation from standard medical practice." (*Id.*).

Although it thus appeared that Dr. Trescot might be a viable witness in defendant's behalf, in multiple email communications with counsel that took place in March of 2007, Dr. Trescot advised that she would not be able to attend a trial. (Doc. 155-2, exh. G). Among her comments to counsel was that "Dr. Durfey, though not a wise man, is a reasonable pain doctor and does not deserve this treatment." (*Id.*). Dr. Trescot offered to do a video deposition at no cost, but counsel advised her that a deposition would be of little use, because he needed live testimony. Unfortunately, absent counsel's ability to guarantee her appearance on a date

certain, a virtual impossibility in a criminal trial, Dr. Trescot indicated she could not testify because she could not reschedule patients. In light of this, counsel asked her to guide him to someone else who might help. (*Id.*) Whether she was able to do so is not clear from the record.

Counsel also contacted Dr. John Swicegood as a potential expert. Dr. Swicegood indicated that he did not believe he would be of assistance in light of his background and the fact that he was "really into compliance and it would be hard for [him] to assist in the defense of someone that is involved in what is being charged." (Doc. 155-2, exh. H). Likewise, counsel's attempts to secure the expert assistance of Dr. Kamel Elzawarhy and Professor David Brushwood were in vain. (Doc. 155-2, exh. E). Counsel states in his affidavit that he sent not less than 24 letters to pain management experts nationwide and refers to composite exhibit E. If in fact he contacted that many individuals, proof of such is not in the record. However, Exhibit E reflects that at least six physicians reviewed some of defendant's medical records. More significantly, the attached correspondence clearly rebuts defendant's assertion that in lieu of preparing for trial counsel was proceeding toward a plea bargain. (Doc. 147 at 15). Furthermore, counsel's affidavit states that until his client instructed him to negotiate a plea, he also tried to familiarize himself with the voluminous evidence involved in this case, working with both defendant's former private investigator David Haubrich and defendant's wife, and reviewing discovery and notes from former counsel (Doc. 155-2, ¶¶ 7-11).

Defendant next asserts that counsel failed to recover documents seized by law enforcement which offered "exculpatory" evidence. Although defendant describes the items that were seized, he does not specifically explain their exculpatory nature, particularly with respect to the twelve charges to which he pleaded guilty. Defendant also posits that the hours defense counsel spent going through boxes which had been placed in storage were a complete waste of time without the defendant's assistance to explain what counsel was seeking. However,

the fact of defendant's detention and any disadvantages this had for the defense cannot be blamed on counsel, as explained above.

Defendant also claims without factual support that in a deliberate attempt to prejudice the defendant and force him to enter a guilty plea the government withheld exculpatory evidence by claiming that certain files did not exist. He contends that his files showed hundreds of properly treated patients and contained dozens of letters from patients and their families expressing their gratitude for what the defendant had done to help make a bad situation better. While this may be true, the fact that defendant conducted his business in accordance with the law and with prevailing medical standards some or even most of the time does not render invalid his admission to the allegations contained within the statement of facts. For the same reason, evidence of such is not necessarily "exculpatory."

Furthermore, some of the very points defendant attempts to make in his memorandum were rebutted by the court at sentencing. For instance, defendant asserts that the records show his efforts to comply with proper guidelines and testing to search for drug abuse and addiction. At sentencing, the court noted that patients with urine tests that were positive for cocaine and marijuana, and negative for the drugs defendant had prescribed, continued to receive prescriptions. (Doc. 86 at 40-41, 43). Defendant notes that there were records of patients terminated from his services due to improper compliance. Again, at sentencing the court noted at least one instance of a terminated patient being reinstated under conditions which never occurred, and another in which a terminated patient was inexplicably reinstated one week later. (Doc. 86 at 41, 44). Defendant also asserts that his notes contained referrals to treatment centers and detox programs. The court pointed to notes where defendant opined that such a referral should be made, but this was never done. (Doc. 86 at 44).

Defendant now proclaims that he is and was not guilty of the crimes to which he pleaded guilty because he "never set out to break the law." Neither defendant's

lack of specific intent to break the law nor his protestation that he was not motivated in his unlawful activities by greed or malice is relevant at this juncture. His guilt or innocence is not at issue. As defendant was fully advised at the plea proceeding, by entering a guilty plea, he would be waiving, or giving up, his right to any defense that he might have to the charges against him, and giving up the right to appeal or otherwise challenge the question of his guilt or innocence. (Doc. 62 at 13).

In sum, defendant asserts in various ways and forms that counsel failed to prepare for trial, failed to prepare a defense strategy, never discussed calling any witnesses, failed to secure an expert, and failed to present or challenge evidence. However, after review of the record, the court concludes that the defendant has failed to meet his heavy burden under *Strickland* of showing that no competent counsel would have acted as his attorney did. *Dingle*, 480 F.3d at 1099.

5. <u>Failure to provide proper review of the PSR</u>

With respect to the presentence investigation report, defendant contends that counsel spent inadequate time with him reviewing the PSR, that the corrections counsel made to the PSR were matters that did not affect sentencing, and that counsel made no meaningful effort to challenge the government's case. Because defendant admitted to the drug weights, amount of loss and restitution via the statement of facts and the plea agreement, no viable objections could have been made as to those issues. Defendant has not identified any viable objection to any other matter that, had it been made, would have altered the outcome of the sentencing proceedings.

Defendant then appears to fault counsel for objecting to the application of the adjustments both for defendant's abuse of trust and for his leadership role, noting that "any experienced attorney would see the independent application of both sentencing elements." (Doc. 147 at 28). Counsel admitted that he had no legal authority for this objection. Making an objection without foundation may have been

unorthodox, but the fact that counsel presented the objection certainly did not prejudice his client.  There is no viable basis for relief here.

**6.  Failure to challenge conduct of "specialized task force"**

Defendant contends that alleged misconduct by AUSA Kunz in other cases, and the fact that AUSA Kunz "specializes" in cases against physicians in which Kunz frequently uses the same expert witnesses is indicative of misconduct. Regardless of what may or may not have happened in other cases, defendant has provided no credible suggestion that  misconduct actually occurred in his case. Counsel states in his affidavit that he was unable to identify any illegal police or prosecutorial misconduct during his tenure in the case, and that no challenge to "task force misconduct" was made due to defendant's guilty plea.[10]  Counsel was not constitutionally ineffective for his failure to challenge any illegal practices which are not apparent from the record and of which he was not aware, and the defendant has not shown he was prejudiced by any specific failure in this regard.

**7.  Failure to recover the color photos of defendant's patients**

Defendant states that throughout the course of his medical practice, he used color photographs to document his patients' problems and progress.  When the government "raided" his office, he notes that these color photographs were among the items confiscated.   He alleges that counsel made no attempt to recover these photographs although they represented exculpatory evidence and could have been used in developing a defense and defense strategy.   Defendant does not explain what defense strategy he believes these items would have supported.  Clearly, the photographs would not have provided a defense to the charges to which defendant ultimately pleaded guilty as set forth in the statement of facts.  (Doc. 59).  As noted

---

[10]By "task force" defendant appears to mean the individuals involved in the initial investigation and raid of his practice.

above, the fact that some, many, or most of defendant's pain management patients were treated appropriately and their prescriptions were for legitimate medical purposes does not excuse the fact that others were not. And the photographs would have been totally irrelevant to the charges involving health care fraud.

8. <u>Counsel refused to help the defendant "in the smallest of ways"</u>

In this ground for relief, defendant complains that counsel did nothing to prevent the fact that legal documents counsel gave to defendant were confiscated at the various county jails such that defendant had limited time to study them or prepare in his own defense. Defendant also complains that counsel was late for visits and "never stayed long." Defendant asserts that it would be nearly impossible to justify the small amount of time counsel spent with him in such a complex case.

Counsel admits that trial preparation would have been more convenient for the defendant and counsel had the defendant not been incarcerated, and clearly the defendant would have been more comfortable awaiting trial at home. This court is also aware that it is nearly a universal complaint of defendants that counsel did not spend enough time with them. The client's satisfaction with the quantity of time he spent with his lawyer is not the barometer by which counsel's effectiveness is measured. In this case, defendant has not suggested what specifically would have been accomplished, and how the outcome of his case could have been affected had counsel spent additional time with him. Furthermore, defendant's guilty plea and his indication to the court that he was "very much satisfied" with his attorney undermine the credibility of his assertions, and he is not entitled to relief.

9. <u>Counsel failed to obtain or present any comprehensive statement regarding defendant's physical health</u>

Defendant next suggest that his age or physical condition warranted a departure and counsel was ineffective for his failure to pursue this issue. He faults

his attorney for his failure to request a comprehensive physical evaluation to assess whether defendant "could survive the rigors of prison life or whether his incarceration would be so extreme that it would [violate] defendant's Eighth Amendment right[s]." (Doc. 147 at 34). Defendant enumerates multiple medical maladies, although it is not clear whether each of these conditions existed at the time of sentencing or have developed or progressed during his incarceration. Defendant also mentions his age, 77 at the time of sentencing. According to § 5H1.1 of the U.S. Sentencing Guidelines, age is ordinarily not relevant in determining whether a departure is warranted. This Policy Statement provides that age may be a reason to depart downward if the defendant is elderly and infirm and a form of punishment such as home confinement might be equally efficient as and less costly than incarceration. *Id.* Similarly, Policy Statement § 5H1.4 of the guidelines provides that while physical condition or appearance is ordinarily irrelevant in determining whether departure may be warranted, an extraordinary physical impairment, such as a seriously infirm defendant, may justify a downward departure particularly if home detention may be as efficient as, and less costly than, imprisonment.

Counsel states in his affidavit that he pursued his client's health issues, to the extent that he was qualified, but saw nothing that rose to the level of providing a valid basis for departure. The composite exhibit to which counsel refers in support of this statement does not provide meaningful support for his assertion.

However, the court was certainly well aware of defendant's age and his physical infirmity. This is evident by the fact that defendant was permitted to remain seated at various points during the proceedings. (See e.g., doc. 86 at 17). With respect to defendant's medical condition, the PSR included a comprehensive list of defendant's past and current medical conditions.[11] (PSR ¶¶ 98-105). The defendant's wife made mention of the defendant's "various infirmaries (sic)" at sentencing, and

---

[11] This information will not be set forth here due to privacy concerns although the defendant himself listed the majority of this information in his motion.

defendant referred to his medical problems in addressing the court (Doc. 86 at 16, 21-22). Thus, the court had ample information regarding defendant's health condition available to it before it imposed sentence. Defendant has not suggested how the availability of any additional medical information might have altered the district court's sentence in this case, and thus there is no basis for concluding that counsel acted unreasonably in this regard.

### 10. <u>Failure to address emotionally charged accusations regarding conduct that was not part of defendant's plea</u>

Defendant contends that at sentencing AUSA Kunz interjected grossly exaggerated and conclusory remarks about the treatment of and in some cases death of certain of defendant's patients. (Doc. 86 at 27-33). Defendant faults counsel for not learning about these "problematic cases" to effectively counter the accusations. He alleges that defense counsel's greatest area of ineffectiveness was his failure to challenge the prosecutor's suggestion that defendant played a role in the deaths of any of his patients.

In his motion, defendant explains his version of the facts with respect to six of his patients, and in essence denies any impropriety with respect to these individuals. The case of Mary Lockamy, who died two days after being told to discontinue certain medication, was reviewed by Dr. Trescot, who concluded that defendant's treatment was appropriate and within the realms of acceptable practice. (Doc. 147 at 36). Ivey Bailey, defendant asserts, died from an intentional overdose of oxycontin. (*Id.* at 37). Danny Tipton continued to receive pain medication due to his threats to the defendant. Defendant asserts that he reported this patient on several occasions but no one assisted in this matter. (*Id.* at 38). Jenelle Rafuse allegedly died from an illicit narcotic overdose after a psychiatrist prematurely discharged her from his care. (*Id.*). Defendant all but accuses the widow of William Wood, Sr. of having intentionally caused his death due to over-application of

Duragesic patches. (*Id.* at 39). Finally, with respect to Eva Edmonson, defendant suggests that her half sister may have administered a fatal injection of phenergan. (*Id.* at 40). The records of the five individuals above who died while under defendant's care were among the patients whose medical records were reviewed by Dr. Trescot. (Doc. 147, exh. 1). As stated earlier, by letter dated April 12, 2006, Dr. Trescot confirmed that she concluded after review that the "records appear to meet the appropriate standard of care and did not reflect a deviation from standard medical practice." (*Id.*). Defendant contends that even if his case was resolved by a plea, counsel should have conducted a "mini-trial" at sentencing to remove all doubt with respect to the defendant's role in these deaths.

Defendant fails to address the contents of paragraph 84 of the PSR. That paragraph, which was contained in the portion of the report relating to "other sentencing factors," provided in pertinent part:

> Several deaths of patients mentioned in the Offense Conduct were attributed to the excessive narcotics prescribed by the defendant. The defendant pleaded guilty to counts in the Indictment which do not capture this harm. The conduct is also not captured within the guideline applications. The probation officer reviewed the report of medical expert, Dr. Ted Parran, M.D., FACP. In his opinion, the actions of Durfey played a direct role in the deaths of Ivey Bailey, Mary Lockamy, William Wood, and Jennifer Alford. The probation officer also reviewed the autopsy reports and death certificates of these individuals. The official cause of death for Ivey Bailey was fentanyl toxicity. The official cause of death for Mary Lockamy was oxycodone toxicity. The official cause of death for William Wood was fentanyl and methadone toxicity. The official cause of death for Jennifer Alford was fentanyl toxicity.

(PSR at ¶ 84). There was no objection to or even any mention of, this portion of the PSR at sentencing. The record reflects that counsel mailed his client a copy of the PSR on August 3, 2007 and then met with the defendant on August 9 to receive his "comments" about the PSR, which counsel then reported to the probation officer. (Doc. 155, exh. J, K; doc. 86 at 3). The comments, as reflected by the addendum to

the PSR, consisted of clarifications to various sections or further explanation of personal background.  In accordance with defendant's comments, the probation officer revised Paragraphs 93, 94, 96, 97, 99, 100, 101, 102, 108, 110, 111, and 115. (PSR ¶ 154).  There was no objection made to the content of paragraph ¶ 84, and as noted above, failure to object to facts contained within PSR constitutes admissions of those facts.  *See United States v. Brown,* 526 F.3d at 697; *United States v. Ndiaye,* 434 F.3d at 1300.  Furthermore, defendant has not suggested that he brought this matter to counsel's attention or asked him to object and counsel failed to follow through.

Defendant is correct that counsel failed to specifically counter AUSA Kunz' remarks with respect to patient deaths, and in fact appeared to allude to the deaths, although not in so many words.[12]  In light of the information contained within the PSR, this was not constitutionally unreasonable.  Defendant is also correct that the court noted the deaths of four patients, presumably those mentioned by name in the PSR, as relevant conduct that it took into account in sentencing.  The court remarked that regardless of the defendant's lack of intent to harm, had he gotten behind the wheel of a car intoxicated and crashed, killing four separate individuals, no one would question the penalty.  (Doc. 86 at 47).  The court also stated that because of the loss that resulted from defendant's failure to adhere to controls that were in place, it found a sentence within and slightly higher than the midpoint of the guideline range to be appropriate.  (*Id.* at 48, 49).  The fact that the court took the patient deaths into account was not improper.  The facts were admitted due to defendant's failure to object, and in any event, sentencing determinations need only be established by a preponderance of the evidence, not beyond a reasonable doubt. See, e.g., *United States v. Faust*, 456 F.3d 1342, 1347, 1348 (11th Cir. 2006); *United*

---

[12]After the four witnesses testified in defendant's behalf, in addressing the court to plead for leniency for his client, counsel argued that the defendant "got it," that is, he understood the wrongs he had committed. Counsel acknowledged that this was "certainly far too late for some of [defendant's] patients" (doc. 86 at 25) but stated that the defendant's understanding and assistance still could be of some use to the government.

*States v. Poyato*, 454 F.3d 1295, 1299 (11th Cir. 2006).  The court was entitled to rely upon the facts in the PSR, including the fact that a medical expert had determined that defendant's actions played a "direct role" in the deaths of four of his patients (PSR ¶ 84) to fashion an appropriate sentence.  Facts that are admitted and relevant should not be disregarded merely because they are "prejudicial."

Assuming for sake of argument that the court would have permitted counsel to attempt to present a viable "defense" both factually and legally to the "relevant conduct," there is no guarantee that defendant's sentence would have been different.  First, it is not at all clear from the record that such an argument would have been successful.  Neither  Dr. Trescot's conclusion that certain of defendant's records "appear to meet the appropriate standard of care" nor defendant's version of how his patients died  negates Dr. Parran's conclusion that the defendant played a "direct role" in the deaths of four patients.  And, even if counsel were able to convince the court that defendant was not directly responsible for one or more of the four patient deaths attributed to him, defendant's sentence still would not necessarily have been different.  While it is true that the sentencing court cited the loss of life as a factor in its sentencing determination, even without this consideration, the sentence imposed was within the guidelines range and otherwise legal.

Defendant also asserts that law enforcement failed to "do its job" after "between 35-50 patients were referred to Sheriff Guy Tunnell's narcotics investigator Faith Bell. " (Doc. 147 at 41).  Defendant rhetorically asks whether the individuals were investigated or any arrests were made, or any record was made of defendant's cooperation with authorities.  This issue was ignored by the government in its response to the § 2255 motion.  If in fact defendant had cooperated with law enforcement in some meaningful fashion, this could have had an impact on his sentence if the government had filed a 5K1 or Rule 35 motion. However, from

defendant's vague allegations, it is impossible to conclude that such a motion would have been warranted or that counsel's performance was in any way constitutionally deficient. First, counsel certainly had no control over, and it appears that even the defendant does not know, whether law enforcement investigated the individuals whose names were supplied to law enforcement. And, even if the individuals were investigated for drug use, if defendant's only "assistance" was providing names to the authorities, this would not have been sufficient to sustain a substantial assistance motion. Defendant's allegations are insufficient to suggest that defendant's sentence could or would have been different had this information regarding his alleged cooperation been made known to the sentencing court.

In conclusion, defendant's case is not unlike that of many if not most defendants who come before this court collaterally challenging the performance of their court appointed attorneys. He was unhappy with the outcome of his case, his sentence, while legal, was not the bargain he had hoped for, and he thought if only his lawyer could have or would have done more, the outcome would have been different. Whether this is true is not for the court to decide as this is not the *Strickland* standard. For the reasons set forth above, defendant has failed to meet his heavy burden of showing that no reasonable attorney could have acted how defense counsel acted, and he is not entitled to relief on his ineffective assistance of counsel claim, either on any individual claim or as a claim of cumulative error.

C. <u>Sentencing Issues</u>

Defendant contends that his sentence did not fully comply with 18 U.S.C. § 3553(a). He complains that the upward adjustments for the amount of drugs attributed to him, his leadership role and for violation of the public trust were made without any evidence whatsoever. As noted supra, defendant admitted in his statement of facts the quantity of drugs for which he would be held accountable, and

he has waived his right to make that challenge. Also as noted above, counsel challenged the application of both the leadership adjustment and the violation of the public trust adjustment, but the court specifically found each adjustment to be proper under the circumstances of this case. No additional evidence was required.

Defendant noted the overwhelming support he had, as shown by the presence of many supporters in the courtroom at sentencing, the fact that about 50 letters of support had been sent to the court, and the supportive testimony of family and friends. If he is making such a claim, neither his popularity nor the fact that he had a strong showing of support within the community provides a legal basis for a departure. He claims that when the court, in its explanation to those present at sentencing, insinuated that it had information or evidence that was unknown to the spectators, the "information" was merely the prosecutor's accusations, not charged or proven conduct. Actually, the information to which the court referred was contained in the PSR, which had not been made public. The court's sentence which fell within the advisory guidelines range and did not exceed the statutory maximum was not improper.

Defendant also claims that the court gave no consideration to his history and characteristics as requires by 18 U.S.C. § 3553(a)(1) and that the sentence he received was in excess of that sentence which would be sufficient but not greater than necessary to comply with 18 U.S.C. § 3553(a)(2). He asserts that the court's sentence was "void of any compassion or recognition of someone who falls toward the end of an exemplary life." In sum, defendant asserts that his sentence violates the "parsimony provision," that is, it is subject to reversal because it was greater than necessary to comply with the provisions set forth in § 3553(a). *Citing United Staets v. Derardi*, 892 F.2d 269, 276-277 (3rd Cir. 1989) (imposition of sentence greater than necessary to meet the purposes of § 3553(a) is reversible even if within a guideline range). The only two Eleventh Circuit cases mentioning the parsimony provision by name are unreported, and neither of them found a violation of the

provision. See *United States v. Pizaon-Rico*, 255 Fed.Appx. 483 (11th Cir. 2007); *United States v. Lazo*, 227 Fed.Appx. 882 (11th Cir. 2007). In any event, a motion to vacate under section 2255 is not a substitute for direct appeal, and issues which could have been raised on direct appeal are generally not actionable in a section 2255 motion and will be considered procedurally barred. *Lynn v. United States,* 365 F.3d 1225, 1234-35 (11th Cir. 2004); *Bousley v. United States,* 523 U.S. 614, 118 S.Ct. 1604, 1610, 140 L.Ed.2d 828 (1998); *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994) (recognizing that a ground is "available" on direct appeal when "its merits can be reviewed without further factual development"); *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). This issue was available for review on direct appeal, and the Eleventh Circuit conducted an independent examination of the record and found no viable claim for relief.

Lastly, he faults the court for its reliance on the facts as set forth in the PSR. This contention is misplaced as failure to object to facts contained within PSR constitutes admissions of those facts, and the court may rely upon them. *See United States v. Brown,* 526 F.3d 691, 697 (11th Cir. 2008), *cert. granted and judgment vacated on other grounds* 129 S.Ct. 1668 (2009); *United States v. Ndiaye,* 434 F.3d 1270, 1300 (11th Cir. 2006); *United States v. Gibson*, 434 F.3d 1234, 1251 (11th Cir. 2006); *United States v. Shelton*, 400 F.3d 1325, 1330 (11th Cir. 2005) (citing *United States v. Walters*, 269 F.3d 1207, 1213 (10th Cir. 2001); *United States v. Joshua*, 40 F.3d 948, 952 (8th Cir. 1994)); see also *United States v. Trott*, 779 F.2d 912, 914 (3rd Cir. 1985) (information in a presentence report may be relied upon to find a factual basis for a guilty plea under Fed.R.Crim.P. 11). Defendant did not identify any uncorrected errors contained in the PSR, and there is no basis for relief on this ground.

### III.  Certificate of Appealability

As amended effective December 1, 2009, § 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  § 2255 11(b).

After review of the record, the court finds no substantial showing of the denial of a constitutional right.  § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully RECOMMENDED:

The motion to vacate, set aside, or correct sentence (doc. 147)  be DENIED.

A certificate of appealability be DENIED.

At Pensacola, Florida, this 20th day of September, 2010.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings. <u>See</u> 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**